**AFFIRM; and Opinion Filed December 5, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00181-CR

### JOSE ISMAEL ARREOLA, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 195th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F-12-00581-N

## OPINION

Before Justices Francis and Myers[1]
Opinion by Justice Francis

A jury found appellant Jose Ismael Arreola guilty of aggravated assault, made an affirmative finding that he used a deadly weapon, and set punishment at twenty-eight years in prison and a $5,000 fine. Appellant challenges the sufficiency of the evidence to support the jury's verdict. He also contends the trial court erred by refusing to admit certain testimony purporting to show the complainant was the first aggressor, by failing to limit the definition of culpable mental states in the jury charge to the result of the charged acts, and by making a deadly weapon finding. We affirm.

This is a domestic violence case. Appellant and the complainant, Maria Escamilla, had an on-and-off dating relationship for close to three years. Escamilla testified that on the night of

---

[1] Justice David Lewis was a member of the panel and participated in the submission of this case, but he did not participate in the issuance of this opinion. *See* TEX. R. APP. P. 41(b).

the charged assault, she and appellant attended two parties at nightclubs in Dallas. She described a quiet ride home, but when they arrived at her house, appellant began to choke and beat her. He dragged her by her hair across the driveway to the patio, where he hit her repeatedly with a landscape brick. Then he broke the glass in the back door and dragged her through the door into the living room. Escamilla was in and out of consciousness throughout the attack, but she was aware that while they were in the living room, appellant penetrated her vagina with his penis, bit her on the cheek, inserted something in her rectum, and cut her with a knife in the lower part of her body. She remembered being in her bedroom on the floor, where appellant hit her repeatedly with his hands and other objects, including an aerosol can. Appellant slapped her and punched her in the face, and throughout the attack repeated she was going to die. Escamilla said she was in so much pain that she begged God to let her die. She described her memory of appellant slicing her forehead and her breast with a knife, but said she could not remember how the remainder of her injuries happened. She recalled coming to consciousness in the shower, appellant leaving, and his mother arriving and calling for help. She had few memories of her initial treatment in the hospital.

Appellant testified he and Escamilla argued on their drive home from the second nightclub; Escamilla accused him of being involved with one of her friends who was at the second party. Appellant decided he was going to pick up some of his things at the house and leave. Escamilla said she could not find the keys when they arrived, and he had to break the door with a hammer so they could get in. Appellant denied striking Escamilla, dragging her either outside or into the house, and harming her in any way in the living room. He said when he had gathered his clothes and was walking out of the bedroom to leave, Escamilla came at him with a knife in each hand, saying she was going to kill him. She stabbed him in the hand and the two engaged in a lengthy struggle. He was not able to take the knives away from her, and she

charged at him three times. After the first time he kicked her in the face. After the second and third times, he threw or "chunked" her away from him, causing her once to land face-first against the bathroom wall and once to come down hard on the toilet seat. Appellant told the jury he never struck Escamilla or used a knife to hurt her in any way. He said her injuries were all a product of their struggling in the bedroom and bathroom while he defended himself from her attacks.

A number of relatives and friends of both Escamilla and appellant testified about their tumultuous relationship. Escamilla and appellant recounted earlier incidents when the other party had been aggressive or violent. On this occasion, however, Escamilla's injuries were significantly more serious than any past incidents described by the witnesses.

Deputy Youngquist of the Dallas County Sheriff's office was the first person to respond to the scene and said "there was blood everywhere . . . [c]eilings, walls, the floor, the bed, the bathroom." He discovered Escamilla wrapped in a sheet in the bedroom; her eyes were swollen closed, her lips cut up badly, and her breasts and hands were cut as well. Because of the injuries to her mouth, Escamilla could only mumble. When asked his evaluation of her condition, Youngquist stated, "Had she not mumbled or spoken, I would have thought she was dead." Brad Burroughs, a fireman-paramedic for the Lancaster Fire Department, testified similarly. He called the home a disaster zone, with blood everywhere. Escamilla was in shock from severe blood loss, and when asked his opinion as to how her injuries had occurred he stated: "My opinion was she was mutilated, beaten to an inch of her life, cut, stabbed. And being that she wasn't bleeding anymore, in my opinion she was left for dead."

When Escamilla reached the hospital she was given transfusions and a chest tube was inserted because broken ribs had punctured her lung, causing air to escape into her chest cavity. A rape kit was performed, which ultimately identified semen in her vagina. Then she underwent

–3–

extensive surgery to repair her numerous wounds. Plates were inserted in her face, and pins were placed throughout her body. Her nearly severed hand was repaired, as were lacerations to her neck, breasts, and back. She also suffered four lacerations in the vaginal area, including one ten-centimeter stab wound that cut through muscle and tissue to the bone, and a second stab wound that penetrated the wall between her vagina and her rectum.

Appellant was charged by indictment with intentionally, knowingly, and recklessly causing serious bodily injury to Escamilla. The jury ultimately found him guilty and answered "yes" to the special issue asking whether he had employed a deadly weapon in that assault.

In his third issue, appellant challenges the sufficiency of the evidence supporting the jury's verdict. Specifically, appellant contends the physical evidence surrounding Escamilla's injuries disproves her account of an assault by appellant and supports his claim of self-defense. When an appellant urges a sufficiency challenge on the basis of his claim of self-defense, we do not look to whether the State presented evidence that refuted self-defense. Instead, we determine, after viewing all the evidence in the light most favorable to the verdict, whether any rational trier of fact (1) would have found the essential elements of the offense beyond a reasonable doubt, and (2) would have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The jury is to determine the credibility of the witnesses and the weight to be given their testimony. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Our duty is to ensure the evidence presented supports the jury's verdict and the State has presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

To establish the offense of aggravated assault, the State was required to prove appellant intentionally, knowingly, or recklessly caused serious bodily injury to Escamilla or caused her bodily injury while using or exhibiting a deadly weapon. TEX. PENAL CODE ANN.

–4–

§§ 22.01(a)(1), 22.02(a) (West 2011 & Supp. 2014). Appellant acknowledged he kicked Escamilla in the face and threw her across the bathroom twice. In addition—viewing the evidence in the light most favorable to the verdict—we credit Escamilla's testimony that appellant beat her with his hands, kicked her, and cut her with a knife on her hand, her breast, her forehead, and her thigh, all the while telling her she was going to die. Her doctors testified to the life-threatening nature of those injuries and others, including significant internal injuries to Escamilla's lungs and vaginal area. Appellant's expert testified she was cut with both a straight-edged knife and a serrated knife. Ample evidence indicates appellant was acting intentionally, that he caused Escamilla serious bodily injury, and used deadly weapons in the assault.

Viewing the evidence in the light most favorable to the verdict, we conclude rational jurors could have found the essential elements of aggravated assault beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914.

Appellant points to what he calls "major inconsistencies" between Escamilla's version of events and the physical evidence at the crime scene; he contends those inconsistencies would not have allowed a reasonable jury to reject his claim of self-defense. Appellant's arguments center on how and where the incident began: although Escamilla testified appellant dragged her through gravel and across a concrete patio, doctors found no gravel in her wounds or "road rash" consistent with such dragging; Escamilla said appellant struck her repeatedly with a landscape brick, but no brick bearing evidence of her injuries was found; she testified appellant then dragged her through a broken glass door, but again doctors found no evidence of glass in her injuries; and she testified that the sexual assault, rectal injury, and some of the cutting injuries took place in the living room, but police found no blood in that room consistent with those injuries. Appellant contends the significant amount of blood found in the bedroom and bathroom was consistent with his version of events.

Although the physical evidence may not bear out the locations where Escamilla testified she suffered certain of her injuries, it is undisputed she suffered those injuries and that—in some fashion—she suffered them at the hands of appellant. We do not view where the actions occurred as determinative, especially because the nature of Escamilla's injuries could have caused her to be confused as to where she was when she received each injury. Indeed, appellant's own medical expert confirmed that a person who had lost a great deal of blood might experience issues with memory and conscious awareness. Regardless, to the extent the evidence included factual inconsistencies, resolution was within the jury's province. The jury resolves any conflicts in the evidence and is free to accept or reject the defensive evidence. *Saxton*, 804 S.W.2d at 914. In this case, the jury was entitled to believe the testimony of Escamilla and to disbelieve appellant. After viewing all the evidence in the light most favorable to the verdict, we conclude a rational jury could have found against the appellant on the self-defense issue beyond a reasonable doubt. *See id.*

We have determined a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, and could have found against the appellant on the self-defense issue beyond a reasonable doubt. *See id.* We conclude, therefore, that the evidence supporting the jury's verdict is sufficient, and we overrule appellant's third issue.

Our sufficiency review takes into account all evidence the jury heard at trial. That evidence included the fact that Escamilla had prior convictions for aggravated assault, possession of marijuana, possession of a controlled substance, and theft over $20,000. And it included the many arguments between Escamilla and appellant, including his allegation that she once hit him in the head with a frying pan. But in his first and second issues, appellant contends the trial court erroneously excluded certain evidence that would have led the jury to a different verdict. He

argues that two witnesses should have been allowed to testify as to specific acts of violence by Escamilla that would have established she was the first aggressor in the incident before us.

In his first issue, appellant complains of the trial court's exclusion of certain testimony from Ramon Guillen, Escamilla's former husband. Guillen was permitted to testify to his opinion that Escamilla was a violent person, but the trial court excluded his testimony concerning three specific incidents involving Escamilla. First, after their relationship was over, Guillen ran into Escamilla at a club; she ripped off a chain he was wearing that she said she had bought him, and she tore his shirt. Second, during their relationship, he once was sitting in the bathroom and told Escamilla (incorrectly) that she had given him a sexually transmitted disease; she broke the door down and ripped his shirt. Third, also during their relationship, Escamilla saw him escorting a female patron to her car as part of his security job; she accused him of sleeping with the patron, chased him around the parking lot while he laughed at her, and keyed his car. The State established Guillen had not had contact with Escamilla in sixteen or seventeen years, and then objected to the testimony, arguing it was too remote and the facts underlying the three incidents were irrelevant to the facts in the pending case. The trial court sustained the objection.

In his second issue, appellant argues the trial court erroneously excluded evidence from Ronald Castro, a long-time acquaintance of Escamilla. Again, Castro was permitted to testify to his opinion that Escamilla was a vindictive person. But he was not permitted to testify that Escamilla sold him a car and told him, while using that car, "she had ran over some folks and got away with it" and "she had hung out the sunroof and shot at people." The State objected to the proffered testimony as hearsay and argued the statements were not relevant to Escamilla's motive, intent, or state of mind in the instant offense.

We review the trial court's decision to exclude evidence for an abuse of discretion. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). The rules of evidence permit a defendant to offer evidence of the victim's character for violence or aggression when the defendant is charged with an assaultive offense. *Ex parte Miller,* 330 S.W.3d 610, 618 (Tex. Crim. App. 2009). A defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor. *See* TEX. R. EVID. 404(a)(2); *Miller*, 330 S.W.3d at 619. This character-trait evidence is admissible, however, only through reputation and opinion testimony. *See* TEX. R. EVID. 405(a); *Miller,* 330 S.W.3d at 619. A defendant may not offer evidence of the victim's prior specific acts of violence to prove the victim's violent character and that the victim acted in conformity with that violent character at the time of the assault. *See* TEX. R. EVID. 404(b)(2); *Miller,* 330 S.W.3d at 619. Therefore, to the extent appellant's proffered testimony of specific acts of violence served only to prove Escamilla's conduct was in conformity with her violent character, the testimony was inadmissible.

A victim's prior specific acts of violence may be admissible if offered for a non-character purpose in the particular case, such as her specific intent or motive for an attack on the defendant. *See* TEX. R. EVID. 404(b); *Miller*, 330 S.W.3d at 620. But these specific acts are admissible only to the extent that they have relevance apart from their tendency to show character conformity. *Torres v. State,* 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). For example, in *Tate v. State,* the defendant offered evidence through a third party that the victim had threatened to harm the defendant on the night in question. *Tate v. State,* 981 S.W.2d 189, 192 (Tex. Crim. App. 1998). The court of criminal appeals concluded the evidence of the specific act was probative of the victim's "state of mind and possibly indicated a motive or demonstration of intent behind the confrontation that evening." *Id.* Appellant argues the specific acts these witnesses described were probative, "specifically with regard to [Escamilla's] state of mind in

relationships with men when she becomes jealous over other women and they tend to explain her aggressive conduct toward [appellant] on the night of the assault." We disagree. The incidents related by Guillen and Castro did not implicate appellant in any way. Nor do they reflect the kind of state-of-mind evidence that could explain Escamilla's purported aggression toward appellant. *Torres*, 71 S.W.3d at 762 ("For purposes of proving that the deceased was the first aggressor, the key is that the proffered evidence explains the deceased's conduct."). The sixteen- or seventeen-year-old acts described by Guillen—tearing clothes and jewelry or chasing him around a parking lot—do not reflect a state of mind consistent with the kind of relentless two-knifed attack alleged by appellant. Further, the only incident Guillen related that involved jealousy over another woman did not result in any violence toward him at all.

As to Castro's proffered testimony, nothing indicated the car-related conduct Escamilla told him about reflected a state of mind relevant to her confrontation with appellant: the incidents did not purport to involve jealousy of another woman in any fashion. Moreover, Castro's testimony would have been hearsay. Appellant argues the statements qualify as statements against Escamilla's interest. *See* TEX. R. EVID. 803(24). To qualify under the statement-against-interest exception, a statement must (1) tend to expose the declarant to criminal liability, and (2) have its trustworthiness clearly supported by corroborating circumstances. *See Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). Here, the proposed testimony fails both prongs: Castro's rendition provides insufficient information to discern whether the statements could expose Escamilla to criminal penalties, and he offered no testimony that indicated the trustworthiness of the statements.

We conclude the trial court did not abuse its discretion in excluding the proposed testimony concerning prior specific acts of violence involving Escamilla. The statements were not admissible under rule 404(b), and Castro's testimony was also properly excluded as hearsay.

Further, the trial court allowed both sides to introduce considerable evidence about Escamilla's prior criminal history and prior conduct with appellant. We overrule appellant's first and second issues.

In his fourth issue, appellant contends he was caused egregious harm by the trial court's failure to limit the definitions of the culpable mental states to the result of the act charged. The trial court submitted definitions on the "nature of the conduct" as well as "result of the conduct."

There are three "conduct elements" that can be involved in an offense: (1) the nature of the conduct, (2) the result of the conduct, and (3) the circumstances surrounding the conduct. TEX. PENAL CODE ANN. § 6.03 (West 2011); *McQueen v. State,* 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). A trial court errs by failing to limit the definitions of the culpable mental states to the conduct element or elements of the offense to which they apply. *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994). An offense defined by causing bodily injury—such as aggravated assault—is a result-of-conduct offense. *See Garfias v. State*, 424 S.W.3d 54, 60 (Tex. Crim. App. 2014). Accordingly, the trial court erred when it failed to limit its definitions of mental states to the result of appellant's conduct. *See Cook*, 884 S.W.2d at 491.

The State concedes the court's general definitions were incorrect, but contends the error was harmless. Appellant did not object to the definitions at trial; accordingly, any error in those definitions is reversible only if appellant was egregiously harmed such that he was denied a fair and impartial trial. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). To determine the actual degree of harm we look to the entire record, the jury charge, and the state of the evidence as a whole, taking into account the contested issues and the weight of probative evidence. *Id.* We have reviewed the entire record of this case and concluded the evidence was sufficient to support the jury's verdict. In addition, the State did not emphasize the improper "nature of conduct" language from the charge in its argument, focusing instead on Escamilla's

injuries—the result of appellant's conduct—and how those injuries were caused. Finally, we look to the application portion of the jury charge. *See Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995) ("In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we 'may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge.'" (quoting *Cook*, 884 S.W.2d at 492 n.6)). The application paragraph in appellant's charge pointed the jury to the proper issue involved in a result-oriented offense. Specifically, the jury was instructed that to find the defendant guilty of aggravated assault, they must find that appellant "intentionally, knowingly, or recklessly caused serious bodily injury" to Escamilla. Consequently, we conclude appellant was not denied a fair trial; he did not suffer egregious harm due to the erroneous general definitions in the charge. We overrule appellant's fourth issue.

In his fifth and final issue, appellant argues the trial court erred by entering an affirmative deadly weapon finding because the State failed to provide adequate notice of its intention to seek such a finding. Appellant's indictment charged that he did:

> intentionally, knowingly and recklessly cause serious bodily injury to Maria Escamilla, hereinafter called complainant, by [1] striking complainant with a hand and hands and a lamp and [2] stabbing complainant with a knife and an unknown object, the exact nature and description of which is unknown and unknowable to the grand jury and [3] cutting complainant with a knife and an unknown object, the exact nature and description of which is unknown and unknowable to the grand jury, during the commission of the assault.

The jury instructions tracked the above language as did the deadly weapon special issue submitted to the jury. Appellant voiced no objection to this issue at any time.

"[A]ccused persons are entitled to notice in some form that the use of a deadly weapon will be a fact issue at the time of prosecution, if the State intends to pursue the entry of a deadly weapon finding." *Ex parte Beck*, 769 S.W.2d 525, 526 (Tex. Crim. App. 1989). The definition of deadly weapon includes anything that in the manner of its use is capable of causing serious

–11–

bodily injury. TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2014). In an aggravated assault case, notice is sufficient if the indictment alleges that some object or instrument caused serious bodily injury to the complainant. *See Gilbert v. State*, 769 S.W.2d 535, 536–37 (Tex. Crim. App. 1989). The State's inability to identify one or more of the deadly weapons alleged did not render its notice to appellant inadequate. *See Mixon v. State*, 804 S.W.2d 107, 108 (Tex. Crim. App. 1991).

Because appellant's indictment alleged that both named and unnamed objects caused serious bodily injury to Escamilla, we conclude appellant had sufficient notice that the State intended to pursue a deadly weapon finding. The deadly weapon special issue tracked the indictment. We overrule appellant's fifth issue.

We affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

130181F.U05

–12–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOSE ISMAEL ARREOLA, Appellant

No. 05-13-00181-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 195th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-12-00581-N.
Opinion delivered by Justice Francis. Justice Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 5th day of December, 2014.